IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| THE UNITED STATES OF AMERICA | | |
| | * | |
| v. | | Criminal No. 22-000199-LKG |
| | * | |
| ANTHONY ANTWON McNAIR, Jr. | * | |

\* \* \* \* \*

## ANTHONY McNAIR SENTENCING MEMORANDUM

The defendant herein, Anthony Antwon McNair, Jr., through his attorneys, James Wyda, Federal Public Defender for the District of Maryland, and Amy S. Fitzgibbons, Assistant Federal Public Defender, hereby files the following memorandum to aid the Court in determining an appropriate punishment.  Mr. McNair entered a plea agreement with the Government, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), recommending that the Court sentence him between 132-156 months.  The agreement leaves open whether this sentence should run concurrent or consecutive to the 31.5 year sentence he received in the District Court for the District of Columbia.  ***The defense requests that the Court sentence Mr. McNair to 132 months concurrent***.

The defense's request is based primarily on two compelling factors.  First, the Government relied on the charged conduct in this case to achieve the conviction in the D.C. District Court.  Consequently, the D.C. sentence adequately accounts for the totality of his conduct.  Second, Mr. McNair's personal history and characteristics, particularly his age, support a concurrent sentence.  Mr. McNair is 37 years old and will be in his 60s when he is released; a consecutive sentence is effectively a life sentence for Mr. McNair.

1

The defense has no objections to the Presentence Report and its calculation of the advisory guideline range.  The parties have agreed that the circumstances of this case warrant a variance, as reflected in the parties' recommended sentence range.  Mr. McNair has been detained since his arrest on April 21, 2022.

**Personal History and Characteristics**

Anthony McNair experienced violence in his family and community from a young age and throughout the critical years of his development into adulthood.  The defense asks the Court to look closely at his background and consider places where, with some support, the trajectory of Mr. McNair's life could have changed for the better.  He will be 38 years old this year and is awaiting designation to the Bureau of Prisons to serve the 31.5 year sentence imposed by the D.C. District Court.  This Court does not need to add an additional decade or more to his sentence.  Mr. McNair has the love and support of his family and the potential to return to the community in his 60s to live out the remainder of his life.

Anthony's parents were married after he was born and the family was able to move into a home provided by Habitat for Humanity in the Anacostia neighborhood of D.C.  Anthony lived at the Skyland Terrace home with his two sisters, Crystal and Malinda.[1]  Anthony's mother, Alma McNair, worked all her life for the District of Columbia Public Schools.  Anthony attended Stanton ES, where his mother was employed, and her watchful eye kept him on track academically and behaviorally.  Anthony was also close to his maternal grandmother, who he considered to be a second mother.  Unfortunately, these women could not protect him from his violent and unpredictable father or the random violence of his neighborhood.

---

[1] Mr. McNair's sisters have submitted letters for the Court's consideration attached at **Exhibit B**.

Anthony was six years old when he was first exposed to gun violence.  He was riding a dirtbike outside his house.  Two years later, he was outside walking to the store when a drive-by shooting occurred.  These incidents and the violence in his community made it unsafe for him to go outside and play.[2]  Unfortunately, there was no safety in Mr. McNair's childhood home.

Anthony McNair, Sr. would frequently beat Anthony and his mother with objects, including boards.  Anthony describes a terrifying incident that occurred in January 2004, when he was 14 years old.  Mr. McNair duct-taped his wife's hands together and submerged her head into the bathtub repeatedly.  Anthony heard the commotion and confronted his father, who left the house.  Alma filed for a civil protection order, which she eventually dropped.  Alma filed for divorce after years of abuse and the seriousness of the attempted drowning.

During this period, Anthony was attempting to transition to high school.  He was expelled in ninth grade.  Shortly thereafter, Anthony was charged with attempted unauthorized use of a vehicle in D.C. juvenile court.  He was placed in a youth shelter house and eventually detained at Oak Hill Youth Center. From the ages of 15-17, Anthony was placed at Oak Hill for several months at a time.  From 1985-2009, Oak Hill Youth Center was operating under a consent decree for failure to provide habitable conditions and appropriate rehabilitative services, including education.[3]  The consent decree was also intended to address rampant violence at the facility. Youth were typically locked down in the equivalent of jail cells and provided limited access to school and programs.  The District of Columbia permanently closed the facility in 2009.

---

[2] Dr. Laura Cooney-Koss evaluated Mr. McNair and prepared a Report for the Court's consideration.  The defense requests that the Court seal the Report, which is filed at **Exhibit A**.
[3] *Jerry M. v. District of Columbia*, was filed in 1985 and the history of the litigation is briefly described at:  https://clearinghouse.net/case/51/.

As indicated by the expert report, Anthony does not appear to have had a full psychological evaluation where his symptoms and trauma history would have been identified. Dr. Cooney-Koss opines: "Had Mr. McNair received trauma-focused intervention and psychiatric medication management at that point in his youth; it is probable that his life trajectory would have been different."  Exhibit A at 14.

As Anthony struggled in the juvenile justice system, his family life was further deteriorating.  Alma moved the children out of the family home to Butler Terrace, a considerably more dangerous neighborhood in Southeast, Washington, D.C.  Anthony intermittently stayed with his mother in his late teens.  Finally, in 2009, Alma was granted a divorce based on domestic violence and was awarded the Skyland Terrace residence.  One week later, Mr. McNair drove his car into the front of the family's home and threatened to kill everyone inside the house.

Anthony's childhood and adolescence were marked by severe and persistent traumatic events, which impacted his decisions and constrained the choices available to him.  Barlett and Steber describe the need for trauma informed care based on the wide-ranging impacts of exposure to complex trauma:

> "Childhood trauma is strongly linked to mental and physical health problems over the lifespan.  It negatively impacts brain development, cognitive development, learning, social-emotional development, the ability to develop secure attachments to others, and physical health; it is also associated with a shortened lifespan...A considerable body of research demonstrates that children suffer the most severe, long-lasting, and harmful effects when trauma exposure begins early in life, takes multiple forms, is severe and pervasive, and involves harm by a parent or other primary caregiver—often referred to as complex trauma."

> "Childhood trauma is more likely to lead to post-traumatic stress disorder (PTSD) than trauma that occurs in adulthood. Children exposed to several different forms of trauma are more likely to exhibit PTSD (e.g., anxiety, depression, anger, aggression, dissociation) than children with chronic exposure to a single type of trauma."[4]

---

[4] Jessica Dym Bartlett & Kathryn Steber, How to Implement Trauma-Informed Care to Build Resilience to Childhood Trauma (2019), Child Trends, available at:

As Dr. Cooney-Koss highlights, Mr. McNair did not receive the benefit of trauma-informed care. Instead, he was institutionalized at Oak Hill Youth Center-a violent prison for children.

Early on, Mr. McNair, although a juvenile, was treated by an adult in the criminal justice system. He was charged as an adult in Prince George's County at the age of 16. He was charged with aggravated assault at age 23. The Bureau of Prisons designated him to serve his sentence at USP-Hazelton. While at Hazelton, Mr. McNair earned his GED and requested to participate in the RDAP program (he lacked sufficient time on his sentence to complete the program and was not enrolled). In 2015, he witnessed a murder at Hazelton where a D.C. inmate Arvel Crawford's throat was slit by another inmate.[5] In 2019, at the age of 31, he was released from BOP custody.

During his prior incarceration, Anthony maintained close relationships with his sisters. He has strong family support and continues to engage with his niece and nephews. These relationships will help him ground him as he serves a very lengthy sentence.

Despite limited formal schooling, Mr. McNair studied for and passed the GED exam. During this period of incarceration, he would be eligible for vocational programs offered by the Bureau of Prisons. Based on the length of his sentence, the Bureau of Prisons will likely designate him to a USP. Mr. McNair requests that the Court recommend designation to USP-McCreary located near Lexington, Kentucky. McCreary offers computer-based occupational

---

https://www.childtrends.org/publications/how-to-implement-trauma-informed-care-to-build-resilience-to-childhood-trauma.

[5] *See,* District Man Serving 93-year sentence for murders killed by inmate last week (March 10, 2015), available at: https://www.washingtonpost.com/local/crime/district-man-serving-93-year-sentence-for-murders-killed-by-inmate-last-week/2015/03/13/9660c012-c98b-11e4-b2a1-bed1aaea2816_story.html.

training and correspondence opportunities for higher education.  The Facility also employs inmates in a UNICOR program that processes patents.  There are opportunities for him to work and pursue education.  He is bright and has the potential to take advantage of BOP programming that will eventually reduce his security level and allow for additional opportunities and eventual transition to the community.

**Nature and Circumstances of the Offense**

On April 21, 2022, Prince George's County Police stopped Mr. McNair based on traffic violations.  After removing Mr. McNair from the vehicle, officers located a Glock .45 pistol and approximately 42 grams of a substance containing fentanyl along with $655.00.  Mr. McNair was initially detained in Prince George's County.  The state charges were dismissed in favor of federal prosecution and Mr. McNair made his initial appearance in the District of Maryland on March 15, 2023.  On September 12, 2023, Mr. McNair made his appearance in the District Court for the District of Columbia on the Indictment alleging that he conspired to rob Brinks armored trucks on two occasions: October 6, 2021, and December 8, 2021.  Mr. McNair elected to go to trial in D.C. and was convicted of six counts.  On March 26, 2025, he was sentenced to 31.5 years.  While he was pending sentencing, Mr. McNair was charged with a stabbing assault that occurred at the D.C. Jail.  The D.C. Superior Court sentenced him to 42 months consecutive to the federal sentence, for a total combined sentence of 35 years.

Both the statute, 18 U.S.C. § 3584 and the United States Sentencing Guideline § 5G1.3, provide the Court with the discretion to run Mr. McNair's sentence concurrent with his undischarged D.C. federal sentence.  18 U.S.C. § 3584 requires the Court to consider the §3553(a) sentencing factors.  United States Sentencing Guideline §5G1.3 provides for a concurrent sentence when the conduct for which the defendant is serving a sentence is "relevant

conduct" to the instant offense.  The facts here do not fall squarely within Guideline §1B1.3's definition of relevant conduct, but as a practical matter, the facts underlying the instant case were considered by the D.C. jury in reaching its verdict and by the sentencing judge.  Guideline § 5G1.3(d) provides a policy statement to guide the Court's discretion.  The Application Note provides five factors, four of which are relevant, for the Court's consideration including:  1) the §3553a factors; 2) the type and length of the prior undischarged sentence;  3) the time served on the undischarged sentence and the time likely to be served before release; and 4) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

The defense submits that the Government's reliance on the charged conduct to prove the conspiracy in the D.C. case supports running the Maryland sentence concurrent.  Here, the D.C. AUSAs introduced evidence and testimony establishing the facts surrounding the traffic stop, and the recovery of the firearm and drugs.  The AUSA called Prince George's County Detective Richard Wilson to testify regarding the circumstances surrounding his traffic stop of Mr. McNair.  DC AUSA Tepfer introduced Detective Wilson's body-worn camera and played the recovery of the firearm for the jury (Trial Exhibit 356).  Through Detective Wilson, the government also introduced the body-worn camera of Officer Zambrana (Trial Exhibit 357) who assisted in Mr. McNair's arrest.  The government introduced additional body-worn camera clips (Trial Exhibits 358 and 359) capturing Mr. McNair's transport.  Detective Wilson authenticated pictures of the handgun and other evidence recovered from Mr. McNair's vehicle.  On cross-examination of Detective Wilson, Mr. McNair's defense counsel elicited testimony regarding the fentanyl seized from the car.  The entirety of the charged conduct in the current case was placed before and considered by the D.C. jury to find Mr. McNair guilty of conspiracy to commit robbery.

In the government's closing argument, they connected the firearm charged in the instant case to the DC robbery conspiracy:

> So to be a member of the conspiracy, you have to have the ready access of firearms. It is not just the firearms in the case. We've showed you that Brock was arrested with a firearm on April 18th, on January 25th, 2023. **And then McNair was arrested with a firearm in April '21[sic].** Because you need ready access to firearms to be in Choppa City and to pull this off.

Transcript, pages 69-70, September 9, 2024.

On March 26, 2025, the D.C. District Court sentenced Mr. McNair. Admittedly, the prosecutor did not highlight the Maryland conduct in his sentencing argument, nor did the Court refer to the Maryland case in reaching his sentence, but the evidence was before the Court, and the outstanding charge was contained in Mr. McNair's Presentence Report.

The Application Note also advises the Court to consider the type and length of the undischarged sentence. Here, Mr. McNair's sentence is a lengthy federal sentence to incarceration. As the Court is aware, he will receive a minimal amount of good-time credit, and his offenses will preclude him from receiving additional credit. The Court should also consider the amount of time left to serve on the undischarged sentence. The Bureau of Prisons will calculate Mr. McNair's projected release date; however, the defense can approximate his potential credit. Although Mr. McNair has been detained since April 21, 2022, there are periods of his pretrial detention that will likely be credited to another sentence. *See,* Presentence Report, paragraphs 48 and 50. The maximum amount of credit the BOP could award him is 47 months for pretrial credit and 63 months for good time credit (15% of 420 months), leaving more than 25 years left to serve. Mr. McNair's best-case scenario would be release at the age of 63. It is unnecessary to incarcerate him into his 70s.

The Government will argue that a concurrent sentence equates to a lack of punishment in this case.  Mr. McNair has been in pretrial detention at the Chesapeake Detention Facility, the D.C. Jail and the Prince George's Detention Center for the last four years.  This is an exceptionally long period of time to be held in pretrial detention conditions.  As the Court is aware, there is no long term educational or vocational programming available at these facilities, and they are not designed for long term placement.  The Government also secured this additional conviction through a plea agreement, which required that Mr. McNair waive the opportunity to appeal this sentence.  Finally, when Mr. McNair is released in his 60s, he will be subject to supervision by two federal courts; any violation of supervised release can be punished by both jurisdictions.   This Court does not need to add another decade of incarceration to Mr. McNair's aggregate sentence.

**Goals of Punishment**

The goals of punishment also support a concurrent sentence in this case.  The imposition of a consecutive sentence would result in Mr. McNair's incapacitation from his mid 60s-mid 70s.  There are significant costs to incarcerating the elderly to serve the goal of incapacitation without a corresponding gain in reduced recidivism.

A report by the Office of the Inspector General found that "aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. [The OIG] further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates.  The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates." Office of

Inspector General, U.S. Dept. of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015).[6]

The Court must also consider the goals of specific and general deterrence.  Here, Mr. McNair was arrested and immediately prosecuted by federal district courts in both Maryland and D.C.  To the extent that general deterrence is effective, this case presents is a clear indication that the federal courts will swiftly prosecute serious crime. Here, a case that started in state court was elevated for federal prosecution and Mr. McNair is subject to significant mandatory minimum penalties and has already received a lengthy sentence.  In terms of specific deterrence, Mr. McNair will be released an elderly man.  He is fortunate to have the support of his sisters and is hopeful that they will be there to help him make the transition to the community.  An additional decade in prison will not further specific deterrence.

On balance, the request for a concurrent sentence represents a reasonable punishment in this case considering Mr. McNair's personal history and characteristics, and the effect of the lengthy undischarged sentence imposed by the D.C. District Court.

**Conditions of Supervised Release**

The defense has reviewed the mandatory, standard and additional recommended conditions with Mr. McNair.  The defense has no objection to the proposed supervised release conditions.  Mr. McNair's conviction on Count 3 (possession with intent to distribute a controlled substance) requires imposition of at least four years of supervised release.  The D.C. District Court imposed concurrent periods of 36 months and 60 months of supervised release.

---

[6] The Report is available at  https://oig.justice.gov/reports/2015/e1505.pdf.

The defense requests that the Court order the supervision in this case to run concurrent to the lengthier period of supervised release imposed in D.C.

**Conclusion**

On behalf of Mr. McNair, the defense respectfully requests that the Court sentence him to 132 months concurrent with the sentence imposed by the United States District Court for the District of Columbia, 1:23-cr-00026.

Respectfully submitted,

JAMES WYDA
Federal Public Defender for
  the District of Maryland


_____/s/_____
Amy S. Fitzgibbons
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Office: (301) 344-0600
Fax: (301) 344-0019
Email: amy_fitzgibbons@fd.org